UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTANA BELMONT,<br><br>                              Petitioner,<br><br>                    v.<br><br>JAMES D. HARTLEY, Warden,<br><br>                              Respondent. | Civil No.     09cv2700-JLS (CAB)<br><br>**REPORT AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.  INTRODUCTION

Petitioner Santana Belmont (hereinafter "Petitioner") is a California prisoner proceeding *pro se* with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] Petitioner was convicted of one count of conspiracy to commit perjury, three counts of perjury by declaration, one count of subornation of perjury and one count of preparing a false document. [Doc. No. 1 at 2.] Petitioner is currently serving a sentence of 12 years in state prison. Id.

Petitioner claims his federal constitutional rights were violated as follow: (1) by failing to adequately investigate the "complete breakdown of communications" between Petitioner and his lawyer, the trial court denied Petitioner his right to effective counsel as guaranteed by the Sixth Amendment of the U.S. Constitution [Doc. No. 1 at 6]; and (2) the trial court violated

1   Petitioner's rights under the Sixth Amendment to the U.S. Constitution when it refused to allow

2   Petitioner to represent himself at trial [Doc. No. 1 at 7].  Respondent has filed an Answer to the

3   Petition arguing that the state court reasonably denied Petitioner's request to substitute appointed

4   counsel and reasonably rejected his request to represent himself [Doc. No. 11-1 at 11- 19.]

5   Petitioner has not filed a traverse.[1]

6                               II.  STATE PROCEEDINGS

7         In a six-count information filed in San Diego Superior Court on December 12, 2006,

8   Petitioner was charged with conspiracy to commit a crime (count one) in violation of Cal. Penal

9   Code § 182(a)(1); perjury by declaration (counts two, three and four) in violation of Cal. Penal

10  Code § 118(a); subordination of perjury (count five) in violation of Cal. Penal Code § 127; and

11  preparing a false paper for fraudulent purpose (count six) in violation of Cal. Penal Code § 134.

12  [Lodgment 1 at 1-9.] It was also alleged that Petitioner had three[2] prison priors (Cal. Penal Code

13  § 667.5(a)) and one strike prior (Cal. Penal Code § 667(b)-(i)). [Lodgment 1 at 9-10.]

14        A jury trial was held beginning on May 23, 2007. [Lodgment 1 at 220; Lodgment 2 at 1.]

15  On the day of trial, Petitioner made a motion to relieve his attorney (known under California law

16  as a *Marsden*[3] motion). [Lodgment 2 at 3.] After a sealed hearing [Lodgment 2, Vol. 1-A, at 4-

17  11], the court denied the *Marsden* motion [Lodgment 1 at 10]. Petitioner then made a motion to

18  represent himself (known under California law as a *Lopez*[4] request).  [Lodgment 1 at 10.] The

19  court denied the *Lopez* request. [Lodgment 1 at 10-11.]

20        On June 1, 2007, a jury convicted Petitioner on all six counts. [Lodgment 1 at 234-239.]

21  In a bifurcated proceeding, the trial court found true that Petitioner had suffered two prison

22  priors and a strike prior. [Lodgment 1 at 240.] The court sentenced Petitioner to a total prison

23  term of 12 years. [Lodgment 1 at 243; Lodgment 2 at 479.]

24
_____

25  [1]Petitioner's traverse was due on October 10, 2010.  Six months later, on April 7, 2011,
    Petitioner filed a motion for extension of time to file a traverse. [Doc. No. 18.] Petitioner was granted an
26  extension until May 9, 2011 [Doc. No. 19] and failed to file a traverse.

27  [2]One prison prior was later stricken by the People. [Lodgment 1 at 10.]

28  [3] People v. Marsden, 2 Cal. 3d 118 (1970).

    [4] People v. Lopez, 71 Cal. App. 3d 568 (1977).

                                    2                              09cv2700

1   On May 2, 2008, Petitioner filed a direct appeal, raising the same Sixth Amendment

2   claims raised in this federal petition, as well as a claim that his sentence violated state law.

3   [Lodgment 3.] On January 29, 2009, the California appellate court denied all of his claims

4   regarding his Sixth Amendment claims and modified the judgment with regard to his sentencing

5   claim. [Lodgment 6 , People v. Belmont, No. D051954, slip. op. (Cal. Ct. App. January 29,

6   2009).] On March 6, 2009, Petitioner filed a Petition for review with the California Supreme

7   Court. [Lodgment 7.] On April 15, 2009, the California Supreme Court denied the petition for

8   review. [Lodgment 8.]

9                           III. UNDERLYING FACTS

10   This Court gives deference to state court findings of fact and presumes them to be correct.

11   See 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36, 113 S.Ct. 517, 121

12   L.Ed.2d 391 (1992) (holding findings of historical fact, including inferences properly drawn

13   from these facts, are entitled to statutory presumption of correctness). The relevant facts as found

14   by the state appellate court are as follows:

15          Although Belmont does not challenge the sufficiency of the evidence to
16          support his convictions, we summarize the facts presented at trial to provide some
            background for our later discussions.

17          By way of stipulation, the jury was apprised that in July 2003, Belmont had
18          been found guilty of, among other crimes, attempted voluntary manslaughter and
            assault with a deadly weapon, stemming out of the May 13, 2003 stabbing attack
19          on his former girlfriend Lagena Davis at the Crown Inn and Suites Motel (Crown
            Inn).  Later that year, while serving a prison term for those earlier offenses,
20          Belmont received a letter from Debra "Chicki" Steinman, another ex-girlfriend,
            who had lost touch with Belmont for several years, had recently discovered he was
21          incarcerated and had contacted him with the hope of reestablishing their romantic
            relationship.

22          Shortly thereafter, the two began corresponding, with Belmont advising
23          Steinman about the earlier incident at the Crown Inn and telling her she "might
            help him file a legal document that might get him out of prison."  He explained
            that such would require her to provide "a letter or some sort of a sworn document"
24          for him.  Although Steinman was nervous and had "reservations" about the
            scheme, she agreed to go along with it because Belmont assured her they would
25          live together and maybe get married once he was released from prison.

26          Letters admitted into evidence revealed that over the course of the next
27          several months, the two regularly corresponded, with Belmont giving Steinman
            information and instructions on how she was to proceed in providing him a
            declaration, which would establish he had been wrongly convicted for the May
28          2003 crimes at the Crown Inn.  Belmont even sent Steinman sketches of the crime
            scene as well as copies of the transcripts from his trial and express instructions

                                       3

about how she was to respond to certain questions that the attorneys would ask her, warning her not to talk to anyone from the District Attorney's (DA's) office. Belmont instructed Steinman to address her letters to him as "legal mail" so that the prison authorities would not read them.

On June 27, 2004, Steinman received a letter from Belmont that contained her proposed "statement," which she then retyped, signed, had notorized and mailed back to him. In the statement, Steinman declared under penalty of perjury that she had been at the Crown Inn on May 13, 2003, and had seen Davis without injuries while Belmont was outside of the motel room and that she later saw Davis come out of the room upset and injured.

On July 12, 2004, Belmont filed a petition for writ of habeas corpus in this court, challenging his earlier convictions based on new evidence, claiming Steinman's attached declaration was "important because [she] saw [Davis] after [Belmont] left the room and [Davis] wasn't injured. [Steinman] also witnessed [Davis] leaving the room injured, but [Belmont] had never re-entered the room." The petition was denied without prejudice as premature due to Belmont's pending appeal in his earlier case.

On November 3, 2004, Belmont filed a second habeas petition in this court with Steinman's declaration attached, challenging his convictions in the earlier case on grounds of ineffective assistance of counsel for not locating Steinman as a witness who would have proven his innocence. Belmont's second petition was denied because he had not first sought relief in the superior court.

On January 25, 2005, Belmont filed a third habeas petition in the El Cajon branch of the San Diego Superior Court, again challenging his convictions in the underlying attempted voluntary manslaughter and assault case on grounds his counsel was ineffective in failing to locate Steinman. After the superior court issued an order to show cause on the third petition, the DA's office began an investigation in which it discovered the letters Steinman had sent Belmont in prison and his letters that had been sent to her in a search of her apartment. During the investigation, Steinman admitted to a DA investigator that she had lied in her notarized statement she had put together based on information received from Belmont, which had then been used as a supporting "exhibit" to the habeas corpus petitions he filed under penalty of perjury.

Although Belmont eventually withdrew his third petition from superior court on September 30, 2005, the DA's office filed the conspiracy to commit perjury and various perjury charges in this case against both Belmont and Steinman. Sometime before trial, Steinman had pled guilty to one count of perjury in exchange for testifying against Belmont in this case. Steinman conceded at trial that her declaration was not true and that she had never been to the Crown Inn. [Lodgment 6 at 2-5.]

The appellate court also summarized the procedural facts that are the background to Petitioner's Sixth Amendment claims as follows:

<u>MARSDEN AND SELF-REPRESENTATION DENIALS</u>

On May 23, 2007, the day set for trial, the court clerk advised the trial judge that Belmont wanted a "*Marsden* motion." After noting that at the last court hearing on May 4, 2007, Belmont had informed the court that he had retained attorney Michael Pedretti to represent him, and Pedretti had not since made any appearances in this case, the trial judge inquired as to whether such was a "dead

4

issue." Appointed counsel replied that it appeared so and the prosecutor represented that he had spoken to Pedretti that morning who said he "was not" and "will not" be retained for Belmont's case.

The court then inquired directly of Belmont whether he wished to have a *Marsden* hearing or motion, which "is one in which you seek to have your appointed counsel relieved and new counsel appointed. Is that, in fact, your request, sir?" When Belmont responded, "Yes, sir," the court had the prosecutor and his staff leave the courtroom and asked Belmont what he would like the court to consider in ruling on his request. After apologizing for any inconvenience caused the court, Belmont replied:

> "I'm afraid for my life right now. As you said, on May 4th, you presented that deal . . . on nine years strike. I didn't take that deal and the courts after that said that if I don't take the deal, I would be exposed to 14 years, eight months. At that point, I was just totally afraid for my life. [¶] And I want . . . to go pro per and fight for my life. Total breakdown in communication with my attorney. I don't have any faith and I don't trust what's going on. I don't have any paperwork. I'm totally locked down in George Bailey for weeks on end. My family and the congregation is totally afraid, and everyone's trying to get together and try to help and we can't get any help whatsoever. And I'm just stuck and we're constantly locked down there. I don't know – I don't have any . . . paperwork of anything. It's just – this is my life."

In response to the court's questions of why Belmont was afraid for his life and whether somebody had threatened him, Belmont explained that he was 50 years old and the court had told him that 14 years, eight months "is what would happen to me if I lose in trial. There's issues I have . . . . I'll be 65 years old when I come out of prison . . . . That's my whole life . . . [A]ll I'm trying to do is . . . fight for my life." Belmont said no one had threatened his physical safety and he "was not afraid of all the potential consequences of the case, but it's issues of this case that [the prosecutor] brought up that's not true and it's just totally prejudiced and biased towards me."

The court then focused on the communication issue, asking Belmont what he meant by saying there was a breakdown in communication with his attorney. Belmont responded:

> "We just . . . don't communicate and I spend more time fighting her than I do the attorney. I was supposed . . . to get my paperwork. I haven't got the paperwork. I was supposed to get a handwriting expert. I didn't get a handwriting expert. An investigator came in and talked to me and told me he was going to give me a handwriting analysis, and all I get is the District Attorney jumping on and getting analysis, saying that's my signature and this, this. And it's not true. It's not. And I've been forthright and I've been honest with the courts. I've been honest with everybody, and it's – so I have to present my own evidence."

The court then invited Belmont's appointed counsel to comment on the matter. Counsel stated that "the only thing [she] would say is that Mr. Belmont is right to the extent that there has been a complete breakdown of communication between the two of us."

09cv2700

After clarifying that it had not told Belmont he would get 14 years, eight months if he went to trial, the court reviewed the history of this case from the time it was filed in August of 2006, up to the present date, noting that Belmont had sought numerous continuances along the way, and had come up with various reasons, including alleged family problems and losses of transcripts and documents, for continuances, which read together with his underlying actions in filing the three habeas petitions, "bespeak manipulation of the system by false statements and a willingness to create out of whole cloth a story that could be used to exonerate [himself]." The court noted that Belmont had been granted several continuances, including one to continue trial pending the outcome of a federal habeas proceeding he had filed regarding his prior strike convictions, before the case had been assigned to its court.

The court further indicated that it had reviewed the preliminary hearing transcript and was aware the judge at that hearing had not been impressed with Belmont's explanations and justifications for seeking an additional continuance of that hearing. At that time, Belmont had represented that he had not been able to locate his family, the prison had lost his paperwork and due to riots at the prison he had not been able to make telephone calls or have any contact with his attorney or others.

Since then, the trial on this matter had been continued two more times and Belmont had written the court a two-page letter before the last status conference on May 4, 2007, essentially conceding he had conspired with Steinman to "write a statement" to file with his writ petitions, but had tried to cooperate with the system to save taxpayers money "to no avail." The trial court's reading of Belmont's letter was that the only reason it "was to no avail [was] because it wasn't on Mr. Belmont's terms." The court further noted that, as discussed earlier, Belmont had represented at the May 4 status conference that he had retained Pedretti, but he had not.

The trial judge denied the *Marsden* motion, stating:

"It is apparent to me that there has been no inadequate representation by [appointed counsel] in this case. Instead, it is apparent, and I find as a matter of fact, that Mr. Belmont simply will not participate in the proceedings or with his counsel until he gets an offer that is to his liking. I find that the conflict to which Mr. Belmont and [appointed counsel] refer is of Mr. Belmont's own creation. It is not, in fact, borne of anything other than the fact that he does not like the message that [appointed counsel] is giving him. [¶] I see this and find . . . this to be the next in a continued series of efforts by Mr. Belmont to delay and postpone this case until he gets an offer that is to his liking . . . . [¶] . . . [¶] All this is to say that what I find to be occurring is Mr. Belmont attempting to delay these proceedings by creating this conflict. It is borne of his refusal and unwillingness rather than inability to cooperate with his counsel."

When Belmont then immediately asked, "[m]ay I call for a *Lopez* [footnote omitted] waiver, sir?," the trial judge responded:

"No. Your *Lopez* request, the Court likewise finds, is made on a day of trial, in an untimely fashion as part of your continued attempt to delay this matter. Mr. Belmont, I don't believe that you are using these procedures in good faith. I find as a matter of fact that you are attempting to invoke these so that you may delay this case yet again. Your request for self-representation is denied."

6

09cv2700

1          Back on the record, the court ordered the transcript of the in camera
2  *Marsden* proceedings sealed, noting that it had denied Belmont's *Marsden* request
   as well as his alternative motion to represent himself "as being untimely and made
3  for the purpose of delay."

4          On appeal, Belmont contends the trial court violated his Sixth Amendment
   rights to counsel by erroneously denying both his *Marsden* motion and his motion
   to represent himself.  We separately address and reject these assertions.
5  [Lodgment 6 at 5-9.]

6                                    IV. DISCUSSION

7  A.  Standard of Review

8          A federal court may not grant an application for writ of habeas corpus on behalf of a
9  person in state custody with respect to any claim that was adjudicated on the merits in state court
10 proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to,
11 or involved an unreasonable application of, clearly established Federal law, as determined by the
12 Supreme Court of the United States"; or (2) "resulted in a decision that was based on an
13 unreasonable determination of the facts in light of the evidence presented in the State court
14 proceeding." 28 U.S.C. § 2254(d); Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v.
15 Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

16         "Clearly established Federal law" refers to the governing legal principle or principles set
17 forth by the Supreme Court at the time the state court renders its decision. Lockyer v. Andrade,
18 538 U.S. 63 (2003). A state court's decision is "contrary to" clearly established Federal law if:
19 (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of
20 facts ... materially indistinguishable" from a decision of the Supreme Court but reaches a
21 different result. See Early v. Packer, 537 U.S. at 8 (citation omitted); Williams v. Taylor, 529
22 U.S. at 405-06.

23         Under the "unreasonable application prong" of section 2254(d)(1), a federal court may
24 grant habeas relief "based on the application of a governing legal principle to a set of facts
25 different from those of the case in which the principle was announced." Lockyer v. Andrade, 538
26 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537 U.S. at 24-26 (stating that a
27 state court decision "involves an unreasonable application" of clearly established federal law if it
28 identifies the correct governing Supreme Court law but unreasonably applies the law to the

1  facts). A state court's decision "involves an unreasonable application of [Supreme Court]

2  precedent if the state court either unreasonably extends a legal principle from [Supreme Court]

3  precedent to a new context where it should not apply, or unreasonably refuses to extend that

4  principle to a new context where it should apply." Williams v. Taylor, 529 U.S. at 407 (citation

5  omitted).

6          "In order for a federal court to find a state court's application of [Supreme Court]

7  precedent 'unreasonable,' the state court's decision must have been more than incorrect or

8  erroneous." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state court's

9  application must have been 'objectively unreasonable.' " Id. at 520-21 (citation omitted); see also

10 Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir.), cert. denied, 540 U.S. 968 (2003). In applying

11 these standards, this Court looks to the last reasoned state court decision, here the decision of the

12 Court of Appeal. See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.2008).

13 B.  Petitioner is not entitled to habeas relief on his first claim that, by failing to adequately

14 investigate the breakdown of communication between Petitioner and his lawyer, the trial court

15 denied Petitioner his Sixth Amendment right to effective counsel.

16         Petitioner claims that by failing to adequately investigate the breakdown of

17 communication between Petitioner and his lawyer, the trial court denied Petitioner his Sixth

18 Amendment right to effective counsel.  [Doc. No. 1 at 6.] Respondent contends that the state

19 courts reasonably rejected the claim. [Doc. No. 11-1 at 11- 19.]

20         Petitioner presented this claim to the California Supreme Court in a petition for review.

21 [Doc. No 1 at 6; Lodgment 7 at 3-8.]  The California Supreme Court summarily denied the

22 petition for review. [Lodgment No. 8.]  In Y1st v. Nunnemaker, 501 U.S. 797, 804 (1991), the

23 Court adopted a presumption which gives no effect to unexplained state court orders but "looks

24 through" them to the last reasoned state court decision.  Petitioner presented this  claim to the

25 appellate court in the same fashion it was presented to the state supreme court. [Lodgment 7 at 3-

26 8; Lodgment 3 at 7-13.]  The appellate court denied the claim in a reasoned opinion. [Lodgment

27 6, People v. Belmont, D051954, slip op. (Cal. Ct. App. January 29, 2009).]

28         The Court will therefore look through the silent denial by the state supreme court to the

appellate court opinion.  The appellate court stated:

A. *The Marsden Denial*
Belmont specifically claims the trial court's failure to investigate his and his appointed trial counsel's assertions that there was a complete breakdown in communication between them constituted constitutional error.  We disagree.

When a defendant seeks to discharge his appointed counsel and have another attorney appointed because of inadequate representation, the trial court must permit the defendant to explain the basis of his contention and relate specific instances of the attorney's inadequate performance.  (*Marsden*, *supra*, 2 Cal.3d at p. 124.)  A trial court hearing such a *Marsden* motion has broad discretion in determining whether the defendant has shown his appointed attorney is not providing adequate representation or whether there is such an irreconcilable conflict between the two that ineffective representation is likely to result.  (*People v. Smith* (1993) 6 Cal.4th 684, 696.)  In such regard, a defendant "may not force the substitution of counsel by his own conduct that manufactures a conflict." (*Ibid.*)  Nor does an "irreconcilable conflict" arise merely because a defendant and his attorney disagree on tactical decisions or because a defendant professes a lack of trust and inability to get along with his attorney.  (*People v. Memro* (1995) 11 Cal.4th 786, 857-858 (*Memro*).)  Moreover, a "trial court need not conclude that an irreconcilable conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*People v. Smith* (2003) 30 Cal.4th 581, 606.)

Denial of a *Marsden* motion "is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." (*People v. Webster* (1991) 54 Cal.3d 411, 435; accord, *Peter v. Hart* (1999) 20 Cal.4th 546, 603 (*Hart*).)  We will not reverse a trial court's denial of a *Marsden* motion absent an abuse of discretion.  (*People v. Moore* (1988) 47 Cal.3d 63, 76 (*Moore*).)

Applying the above standards to this case, we can find no abuse of discretion in the trial court's denial of Belmont's *Marsden* motion.  The record reflects the court fully afforded Belmont an opportunity to air any grievances regarding his appointed trial counsel and asked defense counsel to respond.  Although the court's inquiry to counsel regarding the breakdown of communications with Belmont was limited, more extensive inquiry was not necessary in light of this record.  The court had reviewed the history of this case, had witnessed the earlier status and plea agreement discussions, and had just heard Belmont's general complaints of distrust regarding counsel and these proceedings against him.  Because Belmont did not articulate any specific instances of his appointed counsel's inadequacy or offer any basis for his allegations, we presume the court had no need for defense counsel to further respond to Belmont's claim that there had been a breakdown in communication.  (See *People v. Williams* (1970) 2 Cal.3d 894, 905.)

Belmont did not show that he had tried to work out any breakdown in communication or disagreements with counsel, or that he had given counsel any opportunity to gain his trust by trying to cooperate or get along with counsel.  (See *People v. Smith, supra,* 30 Cal.4th at p. 606.)  "[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*People v. Crandell* (1988) 46 Cal.3d 833, 860; overruled on another point in *People v.*

*Crayton* (2002) 28 Cal.4th 346, 364-365.)  Thus Belmont's generalized claim of distrust of his attorney and representations that there was a breakdown of communication, without more, was not sufficient to show an "irreconcilable conflict" had arisen such that counsel could not provide him effective representation for trial.  (*Memro, supra*, 11 Cal.4th at pp. 857-858.)

In fact, the trial court specifically found there was no showing of inadequate representation or that Belmont and his counsel had such an irreconcilable conflict that counsel would not be able to provide effective representation at trial.  (See *People v. Smith, supra*, 6 Cal.4th at p. 696.)  Nothing in the record reveals otherwise.  We defer to such findings.  (See *People v. Jones* (2003) 29 Cal.4th 1229, 1245.)  Belmont has simply not shown that the failure to replace his appointed counsel would "substantially impair" his constitutional right to assistance of counsel.  (*Hart, supra*, 20 Cal.4th at p. 603.)  The trial court did not abuse its discretion in denying Belmont's *Marsden* motion.

[Lodgment 6 at 9-12.]

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. Bland v. California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir.1994), overruled on other grounds by Schell v. Witek, 218 F.3d 1017 (9th Cir.2000). The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. Id. at 1475-76; United States v. Robinson, 913 F.2d 712, 716 (9th Cir.1990); Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir.1982). The inquiry need only be as comprehensive as the circumstances reasonably would permit, however. King v. Rowland, 977 F.2d 1354, 1357 (9th Cir.1992) (record may demonstrate that extensive inquiry was not necessary).

If a state court denies a motion to substitute counsel, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. Schell, 218 F.3d at 1024-1025. A trial court's refusal to allow substitution of counsel can violate a defendant's Sixth Amendment right to counsel if the defendant and his attorney have an "irreconcilable conflict." Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir.2007), cert. denied, --- U.S. ----, 129 S.Ct. 247 (2008). Not every conflict between a defendant and counsel implicates the Sixth Amendment. Daniels v. Woodford, 428 F.3d 1181, 1196-97 (9th Cir.2005), cert. denied, 550 U.S. 968 (2007). The Sixth Amendment does not guarantee a "meaningful relationship" with counsel. Morris v. Slappy, 461 U.S. 1, 14 (1983). An "irreconcilable conflict" in violation of the Sixth Amendment occurs only where there is a complete breakdown in

10

1   communication between the attorney and client, and the breakdown prevents effective assistance

2   of counsel. Stenson, 504 F.3d at 886; Schell, 218 F.3d at 1026. To determine whether a conflict

3   rises to the level of "irreconcilable," a court looks to three factors: (1) the extent of the conflict;

4   (2) the adequacy of the inquiry by the trial court; and (3) the timeliness of the motion to

5   substitute counsel. See Stenson, 504 F.3d at 887; Hudson v. Rushen, 686 F.2d at 829.

6          Here, the trial court held a *Marsden*[5] (sealed) hearing on Petitioner's request, allowed

7   Petitioner to explain his reasons for seeking substitute counsel, heard a response from trial

8   counsel, and questioned both. [Lodgment 2, Vol. 1-A, at 4-11.] The trial court's inquiry was

9   adequate to permit the court to assess the extent of the alleged conflict between Petitioner and

10  trial counsel. See Stenson, 504 F.3d 886 (trial court's inquiry should be designed to "ease the

11  defendant's dissatisfaction, distrust, and concern" and should provide a sufficient basis for

12  reaching an informed decision); Hudson, 686 F.2d at 829, 831 (state court conducted an

13  adequate hearing when it invited defendant to make a statement and listened to his reasons for

14  wanting new counsel).

15         As for the extent of the conflict, Petitioner's principal reason for seeking new counsel was

16  that there was "a complete breakdown" of communication with his attorney. [Lodgment 1 at 4-

17  6.] Petitioner claimed that he and his attorney were "fighting" and that he had not gotten any

18  "paperwork" or a handwriting expert. [Lodgment 1 at 5.][6] However, Petitioner did not provide

19  any specific instances of his attorney's inadequacy, and general allegations about possible

20  disagreements concerning a defense strategy do not show a total breakdown of communication.

21  Stenson, 504 F.3d at 886 ("Disagreements over strategical or tactical decisions do not rise to

22  level of a complete breakdown of communication."); see also United States v. McKenna, 327

23  F.3d 830, 844 (9th Cir.2003) (counsel's refusal to file motions defendant wanted to file did not

24  constitute a sufficient conflict to warrant substitution of counsel).

25

26         [5]  People v. Marsden, 2 Cal.3d 118 (1970) requires the trial court to permit a criminal defendant
    requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.
27  This California rule substantially parallels the one prescribed by the Ninth Circuit in Hudson v. Rushen.
    See Chavez v. Pulley, 623 F.Supp. 672, 687 n. 8 (E.D.Cal.1985).

28         [6] When questioned by the trial court, Petitioner's attorney merely confirmed that there had
    been a breakdown in communication. [Lodgment 1 at 6.]

11

Moreover, once the trial court reviewed the history of the case, it became apparent that there was no genuine conflict between Petitioner and his attorney.  The trial court summarized the history of the case as follows:

> The case was filed August 7 of 2006.  It charges what, from a reading of the Information, appears to be a sophisticated scheme by Mr. Belmont to commit perjury and fraud on the court.  It involved at various times creating a false account of the circumstances surrounding the event that led to his conviction for attempted voluntary manslaughter and assault with a deadly weapon and corporal injury on a cohabitant.
>
> The magistrate, at least, found probable cause in holding Mr. Belmont to answer to, concluding that those counts were true.  They involved Mr. Belmont writing a false account, mailing it to the female coconspirator, who typed it up and signed it and sent it to her [sic].  He sent her a transcript.  He wrote her, telling her to memorize her story.  And then he filed, I believe, three different Petitions for Writ of *habeas corpus* in which he alleged, among other things, ineffective assistance of counsel.
>
> In making those allegations, he alleged that his trial counsel was ineffective for failing to investigate and discover this exonerating evidence, that, if the People's case holds up, never existed and that Mr. Belmont had just created.
>
> There are two different conspiracy counts.  There are perjury counts alleged.  The varying charges that are before the Court bespeak manipulation of the system by false statements and a willingness to create out of whole cloth a story that could be used to exonerate Mr. Belmont.
>
> Mr. Belmont was first before the Court on this case on September 14th of 2006.  A preliminary hearing was set for October 24th, 2006.  It was continued ultimately until November 21st – I'm sorry – 29th, 2006.  In the meantime, Ms. Brauer had obtained an order to admit an investigator to talk to Mr. Belmont.  A preliminary hearing occurred November 29th, 2006.  Even on that date, Mr. Belmont sought a continuance.  He alleged family problems and the loss of transcripts and documents.  The preliminary hearing judge was not impressed.  Mr. Belmont also attempted to give the preliminary hearing judge one of what I suspect are his many letters, attempting to explain and justify his conduct, but the preliminary hearing judge declined to accept that letter.  I read this from the prelim transcript.
>
> Mr. Belmont was held to answer.  He was arraigned on the Information December 13th, 2006.  A jury trial was set for February 5th.  The matter went to a settlement judge in Department 31 on January 24th.  The People made an offer.  It was rejected by Mr. Belmont.  The trial of February 5th was confirmed.
>
> On January 29th, 2007, Mr. Belmont filed a motion to continue the trial.  He cited his desire to wait until the federal *habeas* proceeding addressing the prior strike convictions had concluded.  The motion also cited some personal medical issues of defense counsel and a need to do some forensic work.
>
> On January 31st, Judge Fraser granted that motion to continue and set the trial for April 4th.  A status conference was set March 14th.  At that March 14th date, the case was assigned to this department for all purposes.  This department continued the trial date until April 16th.  Mr. Belmont wrote this Court a letter,

1     which the Court received March 28th, 2007.  It's dated March 26th, 2007 and is a
two-page handwritten letter, purportedly signed by Mr. Belmont.  The Court
2     furnished copies of that to both counsel on April 5th.

3            In this letter, Mr. Belmont states, quoting a portion:

4                 "A little over three and a half years ago I allowed myself to
get advice from persons who knew about writs of *habeas corpus*.
5     They wrote a writ in my behalf.  I was asked to find someone to
write a statement.  I then conspired with my codefendant to write a
6     statement.  I then filed the writ."

7            He goes on explaining his many efforts to cooperate and save the system
resources, save the Court time, save the taxpayers money, and he says
8     unfortunately it was all to no avail.

9            Well, this Court's reading is that the reason it was to no avail is because it
wasn't on Mr. Belmont's terms.  That is what I strongly suspect.
10            This Court, on April 13th, continued the trial until today's date.  At the last
status conference on May 4th, of course as we discussed, Mr. Belmont said he was
11     – said – this Court's memory is that he had retained Mr. Pedretti.  Of course, that's
not the case.
12

13            It is apparent to me that there has been no inadequate representation by Ms.
Brauer in this case.  Instead, it is apparent, and I find as a matter of fact, that Mr.
14     Belmont simply will not participate in the proceedings or with his counsel until he
gets an offer that is to his liking.  I find that the conflict to which Mr. Belmont and
15     Ms. Brauer refer is of Mr. Belmont's own creation.  It is not, in fact, borne of
anything other than the fact that he does not like the message that Ms. Brauer is
giving him.
16 [Lodgment 2, Vol. 1-A at 7-10.]

17        Given Petitioner's extensive efforts to delay the proceedings, his history of

18 misrepresentations and excuses, and his failure to provide any specific instances of attorney

19 inadequacy, it was reasonable for the trial court to conclude that there was no inadequate

20 representation and no conflict other than one that was being created by Petitioner for purposes of

21 delay.  See United States v. Franklin, 321 F.3d 1231, 1238-39 (9th Cir.2003) (defendant failed

22 to show "extensive conflict" with counsel although he claimed that counsel failed to investigate,

23 never responded to defendant's questions, and failed to act on information provided by

24 defendant).

25        Finally, Petitioner made his motion for substitution of counsel on the day trial was set to

26 begin (after having been continued several times at Petitioner's request).   Because Petitioner did

27 not show a serious conflict with trial counsel, the lateness of his request was another factor

28 counseling against substitution. See Daniels, 428 F.3d at 1200 (assessment of whether motion

1  for substitution is timely depends on whether the conflict is serious enough to justify delay); <u>see</u>

2  <u>also</u> Hudson, 686 F.2d at 831 (noting that "the motion to substitute counsel came at the close of

3  the prosecution's case and to grant it would have required either a significant delay or a

4  mistrial").  Petitioner, therefore, has not shown that the trial court's denial of his motion to

5  substitute counsel violated his Sixth Amendment rights.

6  C.  <u>Petitioner is not entitled to habeas relief on his second claim that his Sixth Amendment rights</u>

7  <u>were violated when the trial court refused to allow Petitioner to represent himself.</u>

8          Petitioner claims that the trial court violated his rights under the Sixth Amendment when

9  it refused to allow Petitioner to represent himself at trial.  [Doc. No. 1 at 7.]  Respondent

10  contends that the state courts reasonably rejected the claim.  [Doc. No. 11-1 at 11- 19.]

11          Petitioner presented this claim to the California Supreme Court in a petition for review.

12  [Doc. No 1 at 7; Lodgment 7 at 8-11.]  The California Supreme Court summarily denied the

13  petition for review.  [Lodgment No. 8.]  In <u>Y1st v. Nunnemaker</u>, 501 U.S. 797, 804 (1991), the

14  Court adopted a presumption which gives no effect to unexplained state court orders but "looks

15  through" them to the last reasoned state court decision.  Petitioner presented his  claim to the

16  appellate court in the same fashion it was presented to the state supreme court.  [Lodgment 7 at 8-

17  11; Lodgment 3 at 14-16.]  The appellate court denied the claim in a reasoned opinion.

18  [Lodgment 6, <u>People v. Belmont</u>, D051954, slip op. (Cal. Ct. App. January 29, 2009).]

19          The Court will therefore look through the silent denial by the state supreme court to the

20  appellate court opinion.  The appellate court stated:

21      *B.  Self-Representation Denial*
            Belmont also claims the trial court erred in denying his motion to proceed in
22  propria persona, specifically arguing it incorrectly assumed that his request would
    require a continuance instead of permitting him to immediately try his case without
23  delay.  We find no abuse of discretion on this record.

24          In *Faretta v. California* (1975) 422 U.S. 806, 834-835 (*Faretta*), the United
    States Supreme Court declared that the Sixth Amendment right to the assistance of
25  counsel included the separate right of an accused to choose self-representation.
    The court noted in *Faretta* that the defendant's request had been made well in
26  advance of trial.  It observed that trial courts are not required to honor requests that
    are untimely or that are made solely to manipulate.  It held only that where an
27  unequivocal and timely request is made, it must be honored if the defendant makes
    an intelligent waiver of his or her right to an attorney.  (*Id.* at pp. 835-836.)

28          Our Supreme Court has interpreted *Faretta, supra,* 422 U.S. 806, to permit

14                                                          09cv2700

trial courts in their sound discretion to grant or deny late requests for self-representation.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 809.)  In exercising its discretion, the court should consider such factors, originally set out in *People v. Windham* (1977) 19 Cal.3d 121(*Windham*), as the " ' " ' quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " [Citations.]' [Citation.]" (*People v. Clark* (1992) 3 Cal.4th 41, 98-101 (*Clark*).)

Moreover, as to whether a request for self-representation is unequivocal, in *People v. Marshall* (1977) 15 Cal.4th 1, our high court explained that circumstances apart from the defendant's own words may be indicative of an equivocal, and therefore invalid, *Faretta* request:  "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words.  Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion.  A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Id.* at p. 23; see also *People v. Barnett* (1998) 17 Cal.4th 1044, 1087.)

Here, Belmont's day-of-trial request to represent himself, combined with his statements about not trusting what was going on with the negotiations in his case because of his strike situation, and his claims he did not have the "paperwork of anything," did not have a handwriting expert of his own, and needed to present his own evidence, plainly indicated he was not prepared to proceed as his own counsel on that day.  Under the circumstances, his request was not made "within a reasonable time prior to the commencement of trial" and was therefore committed to the sound discretion of the trial court.  (See *Clark, supra*, 3 Cal.4th at pp. 98-100;  *Moore, supra*, 47 Cal.3d at pp. 79-81.)

Although the court did not specifically recite in its decision rejecting his request that it had considered the so-called *Windham* factors (*Clark, supra,* 3 Cal.4th at p. 101), a review of those factors in light of this record convinces us that the court did not abuse its discretion in denying the motion (*id.* at p. 100).  In the context of these proceedings, Belmont's motion was equivocal.  His request to "go pro per" was mentioned in conjunction with his *Marsden* motion and not pursued until the court denied that motion and jury selection was about to begin.  Obviously, based on Belmont's comments to the court throughout the in camera hearing, the trial would have had to be continued to allow Belmont to prepare.  Unlike the situation in *People v. Tyner* (1977) 76 Cal.App.3d 352, on which Belmont relies, Belmont did not represent that he was ready to proceed with the trial as the defendant in *Tyner* had represented.  (*Id.* at pp. 354-355.)  Belmont's comments regarding self-representation were precisely the sort of "'impulsive response'" to the court's denial of his *Marsden* motion that has been rejected as an equivocal request to act as his own attorney.  (See *Barnett, supra*, 17 Cal.4th at pp. 1087-1088; *People v. Hines* (1997) 15 Cal.4th 997, 1028.)

In sum, the trial court was well within its discretionary authority to conclude the request was untimely, made for purposes of delay and not really a good faith request for self-representation.  Belmont presented the trial court with the kind of late, potentially manipulative *Faretta* motion which both the United States and California Suprem Courts have indicated judges have the discretion to

15

1   deny.  Here, the trial court soundly exercised its discretion.  There was no error in
    this regard.
2   [Lodgment 6 at 12-15.]

3       A defendant has the right to represent himself *pro se* or to be represented by an attorney.

4   Faretta, 422 U.S. 806, 807 (1975).  In order to successfully invoke the right to self-

5   representation, the defendant's waiver of counsel must be "timely, not for the purposes of delay,

6   unequivocal, and knowing and intelligent."  United States v. Erskine, 355 F.3d 1161, 1167 (9th

7   Cir. 2004).  Even a timely request may be denied if it has been made with an intent to cause

8   delay.  United States v. Kaczynski, 239 F.3d 1108, 1117-18 (9th Cir. 2001); see also United

9   States v. Smith, 780 F.2d 810, 811 (9th Cir. 1986) (stating that a demand of self-representation is

10  timely if made prior to jury selection or before jury is empaneled, unless made for the purposes

11  of delay).

12      For the reasons set forth above, it was reasonable for the court to conclude that

13  Petitioner's only purpose in requesting  self-representation was for purposes of delay.  Moreover,

14  the *Lopez* request was not made by Petitioner until after the trial court had denied his *Marsden*

15  motion and therefore the request for self -representation was not unequivocal. [Lodgment 1 at

16  10-11.] Finally, it was apparent that Petitioner was not prepared to go forward with jury

17  selection, as he earlier claimed not to have any "paperwork" and he made no effort to assure the

18  trial court that his request was genuine and that he was prepared to go forward with trial.

19  [Lodgment 1 at 4-11.] Therefore, it was reasonable for the trial court to deny Petitioner's motion

20  for self -representation.  Accordingly, no Sixth Amendment violation has been shown.

21                          V.  CONCLUSION

22          For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

23  issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing

24  that Judgment be entered denying the Petition for Writ of Habeas Corpus.

25      **IT IS ORDERED** that no later than **June 17, 2011**, any party to this action may file

26  written objections with the Court and serve a copy on all parties.  The document should be

27  captioned "Objections to Report and Recommendation."

28      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

                                    16                                  09cv2700

Court and served on all parties no later than **July 1, 2011**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objection on appeal of this Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).


DATED:  May 13, 2011


_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge

09cv2700